```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF GEORGIA
                         COLUMBUS DIVISION

PLEASANT GROVE MISSIONARY          *
BAPTIST CHURCH OF RANDOLPH
COUNTY, INC.,                      *

     Plaintiff,                    *
                                        CASE NO. 4:11-CV-157 (CDL)
vs.                                *

STATE FARM FIRE & CASUALTY         *
COMPANY,
                                   *
     Defendant.
                                   *
```

O R D E R

In this insurance dispute, Plaintiff Pleasant Grove Missionary Baptist Church of Randolph County ("Pleasant Grove") seeks production of certain documents created and maintained by employees of Defendant State Farm Fire & Casualty Company ("State Farm"). State Farm contends that the documents are protected from discovery under the work product privilege. For the reasons set forth below, the Court agrees that the documents are protected work product, and the Court therefore denies Pleasant Grove's Motion to Compel (ECF No. 10).

FACTUAL BACKGROUND

Pleasant Grove purchased a church insurance policy from State Farm in 2008 and renewed the policy in 2009. Compl. Ex. A, Church Policy Renewal Certificate, ECF No. 1-2 at 21-22. The policy contained an "Actual Cash Value Endorsement," which

stated that the value of covered property "will be determined at actual cash value as of the time of loss or damage" and that State Farm would not pay more than the smaller of the policy limit or "the actual cash value of the lost or damaged property as of the time of loss or damage." Compl. Ex. A, Actual Cash Value Endorsement, ECF No. 1-2 at 29. The policy also contained a "Fungus (Including Mold) Exclusion Endorsement," which stated that a loss due to the growth, proliferation, spread or presence of mold or mildew was not a covered loss. Compl. Ex. A, Fungus (Including Mold) Exclusion Endorsement, ECF No. 1-2 at 31.

On February 8, 2010, Pleasant Grove's pastor, Rev. Roosevelt Zanders, contacted the church's State Farm agent to report that storms in early January 2010 had blown shingles off the church's roof and that there was water damage on the sanctuary ceiling. *E.g.,* Def.'s Resp. to Mot. to Compel Ex. A, Dietrichs Aff. ¶ 3, ECF No. 13-1; *accord* Pl.'s Mot. to Compel Ex. A, Activity Log 8, 2/9/2010 entry, ECF No. 10 at 8. Rev. Zanders first noticed the water damage on the sanctuary ceiling on the first Sunday in January 2010. Dietrichs Aff. ¶ 3. State Farm assigned in-house adjuster Chandler Christie to investigate the claim. Christie inspected the church on March 1, 2010 and made the following entry into State Farm's activity log on March 3, 2010:

> Inspected with Mr. Zanders on Monday afternoon. Wind damage to both slopes over the sancuary [sic]. It will need to be reroofed. Interior damage to the ceiling inside. The ceiling will need re-texturing. Explained to insd. Explained RCB and ACV. He understood.

Pl.'s Mot. to Compel Ex. A, Activity Log 7, 3/3/2010 entry, ECF No. 10 at 7. Christie determined that the actual cash value of replacing the roof over the sanctuary and repairing the water damage to the interior sanctuary ceiling was $6,267.79. *Id.* at 3/4/2010 entry. Christie issued payment in that amount to Pleasant Grove on March 4, 2010, and he closed the claim.

In late May 2010, State Farm received two identical letters from Rev. Zanders, one dated May 20, 2010 and the other dated May 24, 2010. Def.'s Resp. to Mot. to Compel Ex. B, Letter from R. Zanders to State Farm (May 20, 2010), ECF No. 13-2; Def.'s Resp. to Mot. to Compel Ex. C, Letter from R. Zanders to State Farm (May 24, 2010), ECF No. 13-3. In the letters, Rev. Zanders stated that Pleasant Grove did not agree with Christie's evaluation of the church's loss. *E.g.*, Def.'s Resp. to Mot. to Compel Ex. B, Letter from R. Zanders to State Farm (May 20, 2010), ECF No. 13-2. Rev. Zanders also stated that Pleasant Grove had two contractors evaluate the damages. *Id.* State Farm reopened the file and asked Pleasant Grove to submit the contractors' estimates for review. Pl.'s Mot. to Compel Ex. A, Activity Log 7, 5/21/2010 entry, ECF No. 10 at 7.

Shortly after State Farm reopened the claim, State Farm received an invoice for water extraction from RU Group in Macon, Georgia. Pl.'s Mot. to Compel Ex. A, Activity Log 7, 5/26/2010 entry, ECF No. 10 at 7. The invoice was for $2,678.28 and was dated March 22, 2010. *Id.* State Farm employee Buffie Marshall contacted Rev. Zanders to ask if the water extraction bill was related to the loss that had been reported on February 8. *Id.* Rev. Zanders told Marshall that Pleasant Grove had hired a public adjuster named Jay Barnes to handle the matter for the church. *Id.*

State Farm assigned Pleasant Grove's claim to independent adjuster Laura Martin, who was assisted by senior claims representative Richard Tison. Def.'s Resp. to Mot. to Compel Ex. D, Tison Aff. ¶¶ 8-9, ECF No. 13-4. On June 2, 2010, Tison went to Macon, Georgia to interview someone from RU Group about the water extraction invoice so he could determine whether it was related to Pleasant Grove's February claim. *Id.* ¶ 10. When he arrived at the address on the invoice, he found that it was a beauty supply store, but the woman who was working at the store did not know where RU Group was located. *Id.* ¶ 11; Pl.'s Mot. to Compel Ex. A, Activity Log 6, 6/3/2010 entry, ECF No. 10 at 6. Martin was later able to contact Carlton Pitts of RU Group, who sent State Farm photos of the damage, but the photos were too small to be of use. Pl.'s Mot. to Compel Ex. A, Activity

4

Log 5, 6/8/2010 entry, ECF No. 10 at 5.  When questioned about the amount of equipment he used, Pitts stated that he did an "enhanced drying."  Pl.'s Mot. to Compel Ex. A, Activity Log 6, 6/7/2010 entry, ECF No. 10 at 6.

Martin also contacted Barnes because Rev. Zanders advised State Farm that Barnes would be acting as Pleasant Grove's public adjuster.  When Martin spoke with Barnes, Barnes said that he was not serving as a public adjuster but as a contractor providing a damage estimate to Pleasant Grove.  Def.'s Resp. to Mot. to Compel Ex. E, Martin Aff. ¶ 6, ECF No. 13-5.  On June 17, 2010, Martin went to inspect the church, and Rev. Zanders was present for the inspection.  *Id.* ¶ 7.  Martin evaluated the damage to the roof and then walked through the inside and around the outside of the building, observing the damage and taking photographs.  *Id.*  Martin found "water damaged ceilings in main sanctuary, foyer, secretary office, storage room at front of main bldg., mens bath entry, ladies bath entry, hallway on left of church, Pastor's office and kitchen at rear of structure." Mot. to Compel Ex. A, Activity Log 5, 6/18/2010 entry, ECF No. 10 at 5.

While Martin was at Pleasant Grove, Barnes came and presented her with his estimate for repairing the church in the amount of $181,260.11.  Martin Aff. ¶ 8; Pl.'s Mot. to Compel Ex. A, Activity Log 5, 6/18/2010 entry, ECF No. 10 at 5.  Martin

5

reviewed the estimate and found that it was "basically an estimate to renovate and upgrade the entire Church building and not just the damaged roof area and sanctuary ceiling from the windstorm." Martin Aff. ¶ 8; Pl.'s Mot. to Compel Ex. A, Activity Log 5, 6/18/2010 entry, ECF No. 10 at 5. Martin "realized that there were likely to be some problems with this claim." Martin Aff. ¶ 8. Martin noted in the activity log that the "Xact" estimate based on her inspection was $9,689.18. Pl.'s Mot. to Compel Ex. A, Activity Log 4, 6/20/2010 entry, ECF No. 10 at 4.

Martin contacted Richard Wallace of State Farm's Special Investigative Unit ("SIU") to discuss her concerns about the claim. Martin Aff. ¶ 10. SIU "is not normally involved in the investigation of routine property damage claims;" rather, SIU is generally responsible for claims "in which questions arise regarding the merits of the claim." Def.'s Resp. to Mot. to Compel Ex. F, Wallace Aff. ¶ 4, ECF No. 13-6. Martin and Wallace met on June 22, 2010. During that meeting, Wallace learned that Pleasant Grove had not replaced the roof or repaired the sanctuary ceiling. *Id.* ¶ 8. Wallace also learned that Barnes had provided the $181,260.11 estimate; Wallace was familiar with Barnes from a previous case and had concerns based on Barnes's background and on the large increase from Christie's initial estimate to Barnes's estimate. *Id.* ¶¶ 13-14.

Wallace discussed the claim with Fire Field Claims Team Manager Randy Ragans, and he recommended that State Farm retain an attorney, Mark Dietrichs, who was familiar with Barnes and who had previously represented State Farm "in the handling of suspicious property damage claims."  *Id.* ¶ 15.  Ragans reassigned the claim to Tison, who was to investigate and resolve the claim with Wallace's assistance.  *Id.* ¶ 16; Activity Log 3, 6/22/2010 1:41 PM entry, ECF No. 10 at 3.  State Farm formally retained Dietrichs on June 24, 2010.  Wallace Aff. ¶ 18.

On June 23, 2010, Martin started making entries based on her June 17 inspection into State Farm's "Xactimate program, without regard to whether or not the damage [she] had observed was covered, in an effort to compare and analyze the information calculated by Chandler Christie and Jay Barnes."  Martin Aff. ¶ 14.  Martin never completed this task because the claim was reassigned to Tison and Wallace.  *Id.*

On August 3, 2010, Tison and Wallace interviewed Carlton Pitts and Doug Watson of RU Group regarding the water extraction invoice.  Tison Aff. ¶ 18.  Tison and Wallace took a recorded statement from Pitts, and the statement was later transcribed.  *Id.*

State Farm retained Randall Peters, a professional engineer, to inspect the church building.  Pl.'s Mot. to Compel

Ex. F, Def.'s Resp. to Pl.'s 1st Interrogs. 7, ECF No. 10 at 25. Peters "found no evidence of any damage to the roofing system of the church or to any other parts of the sanctuary or church building from wind or other direct weather-related event or any damage from fungal growth associated with any roofing system leakage." *Id.*  Rather, Peters determined that there was "significant shingle slippage on the sanctuary roof, openings in metal flashing along the steeple and significant long-term leakage on the steeple." *Id.*  He also observed improper nailing of shingles, woodpecker damage, water damage from HVAC equipment, and inactive termite infestations. *Id.*  Peters concluded that the damage to the ceiling inside the church "had occurred over a long period of time from numerous events." *Id.*

State Farm has refused to produce several documents to Pleasant Grove, contending that the documents are privileged work product: (1) Laura Martin's post-June 22, 2010 analysis of scope of damage; (2) Richard Tison's July 2010 analysis of scope of damage; (3) State Farm's activity log after June 22, 2010; and (4) the transcript of Carlton Pitts's interview.  Pleasant Grove asserts that the documents are not privileged and should be produced.

DISCUSSION

"Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation

8

or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). A party seeking "fact" work product—the type of work product at issue here—may discover the materials if the party seeking it shows "that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). The first question for the Court is whether the documents at issue here were "prepared in anticipation of litigation." If the answer is yes, the Court must determine whether Pleasant Grove has a substantial need for the materials and cannot obtain their substantial equivalent by other means.

"The general rule for determining whether a document can be said to have been 'prepared in anticipation of litigation' is whether 'the document can fairly be said to have been prepared or obtained because of the prospect of litigation, . . . (and not) in the regular course of business.'" *Carver v. Allstate Ins. Co.*, 94 F.R.D. 131, 134 (S.D. Ga. 1982) (alteration in original) (quoting 8 Wright & Miller, Fed. Practice & Procedure: Civil § 2024 (1970)). The courts have recognized that insurance company investigating documents may be both "because it is the ordinary course of business for an insurance company to investigate a claim with an eye toward litigation." *Id.* The

9

question whether insurance company investigatory documents were "prepared in anticipation of litigation" turns on the facts of the case. *Id.*; *accord, e.g., Allstate Ins. Co. v. Ever Island Elec. Co.*, Civil Action No. 1:03-CV-3817-JEC, 2007 WL 2728979, at *6 (Sept. 17, 2007). While the early stages of claims investigation is focused not on the contingency of litigation but on whether to pay the claim, at some point, an insurance company's activity may shift "from mere claims evaluation to a strong anticipation of litigation." *Carver*, 94 F.R.D. at 134. At that point, when "the probability of litigating the claim is substantial and imminent," the insurance company's investigatory documents are considered work product. *Id.*

For example, in *Carver*, the court found that diary sheets created by an insurance company employee during initial investigation of a fire loss were discoverable but that diary sheets prepared by insurance company's investigative unit after the insurance company determined that the fire was suspicious were not. *Carver*, 94 F.R.D. at 132, 135. Similarly, in *Lett v. State Farm Fire & Cas. Co.*, 115 F.R.D. 501 (N.D. Ga. 1987), the court found that work product privilege applied to documents created by the insurance company's special investigation unit after the insurance company determined that the loss was caused by a suspicious fire. *Lett*, 115 F.R.D. at 503; *accord Ever Island Elec. Co.*, 2007 WL 2728979, at *6 (finding that work

10

product privilege applied to documents created after an insurance company referred the claim to its subrogation counsel because an investigator determined that the cause of the fire was a faulty extension cord).

Pleasant Grove appears to concede that some of the documents created by State Farm's employees and agents are work product; Pleasant Grove simply contends that State Farm did not strongly anticipate litigation until September 23, 2010, when Randall Peters inspected the church and concluded that the loss was not due to a single windstorm.  *See* Pl.'s Br. in Supp. of Mot. to Compel 14-15, ECF No. 11 ("Coverage was not in question, and the only issue between the parties was the amount of the damages, until Mr. Peters issued his report.").  The Court finds, however, that State Farm began strongly anticipating litigation on June 22, 2010, after State Farm received Pleasant Grove's supplemental claim, which included water extraction services that were inconsistent with State Farm's initial investigation and also included repair estimates that were nearly thirty times the amount State Farm initially paid for the claim related to the damaged roof.  Based on those circumstances, State Farm decided to have its investigative unit handle the claim, and State Farm determined that it would be necessary to hire an attorney to help handle the claim.  *See, e.g., Cordell v. Pac. Indem. Co.*, No. CIVA 4:05CV167 RLV, 2006

WL 3335128, at *3 (N.D. Ga. Nov. 13, 2006) (finding that "proper line of demarcation" was when claim was turned over to special investigations unit based on suspicion that loss was not covered due to arson). Accordingly, the Court concludes that the investigatory documents created by State Farm after June 22, 2010 were prepared in anticipation of litigation, including (1) Laura Martin's post-June 22, 2010 analysis of scope of damage; (2) Richard Tison's July 2010 analysis of scope of damage; (3) State Farm's activity log after June 22, 2010; and (4) the transcript of Carlton Pitts's interview.

The next question is whether Pleasant Grove has a substantial need for the materials and cannot obtain their substantial equivalent by other means. Given that State Farm has agreed to make Martin, Tison and Wallace available for depositions, the Court finds that Pleasant Grove has available to it a method for obtaining the substantial equivalent of the documents that were created in anticipation of litigation. *See, e.g., Lett*, 115 F.R.D. at 504 (finding that plaintiffs had not established substantial need for work product because they could obtain the facts through depositions of the persons who prepared the privileged reports); *Carver*, 94 F.R.D. at 136 (same). The Court therefore holds that investigatory documents created by State Farm after June 22, 2010 are privileged and not discoverable. *See* Rule 26(b)(3).

CONCLUSION

In conclusion, the Court finds that investigatory documents created by State Farm after June 22, 2010 are protected under Rule 26(b)(3).  Therefore, the Court denies Pleasant Grove's Motion to Compel (ECF No. 10).

IT IS SO ORDERED, this 4th day of June, 2012.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE